**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

CORPORATE COMMUNICATION
SERVICES OF DAYTON, LLC,

                                Case No. 3:08-CV-046

          **Plaintiff,**

                                Judge Thomas M. Rose

-v-

MCI COMMUNICATIONS
SERVICES, INC.
D/B/A VERIZON BUSINESS SERVICES,

          **Defendant.**

_____

**ENTRY AND ORDER OVERRULING CCS's MOTION FOR
RECONSIDERATION (Doc. #60), GRANTING IN PART AND
OVERRULING IN PART CCS's PARTIAL MOTION FOR SUMMARY
JUDGMENT (Doc. #26) AND GRANTING IN PART AND OVERRULING
IN PART MCI's MOTION FOR SUMMARY JUDGMENT (Doc. #25)**

_____

      This matter arises from a business relationship between Plaintiff Corporate

Communication Services of Dayton, LLC ("CCS") and Defendant MCI Communications

Services, Inc. d/b/a Verizon Business Services ("MCI").[1] This Court has diversity subject matter

jurisdiction pursuant to 28 U.S.C. § 1332 and venue lies in the Western Division at Dayton of the

Southern District of Ohio.

      CCS's Amended Complaint brings eight Claims for Relief against MCI. (Doc. #14.)

CCS's First Claim for Relief is for breach of contract. The Second Claim for Relief is for

fraudulent inducement and the Third Claim for Relief is for negligent misrepresentation. CCS's

---

[1]According to the Defendants, on January 6, 2006, MCI, Inc. and its subsidiaries and
affiliates, including MCI Communications Services, Inc., merged into and with Eli Acquisition,
Inc., a wholly-owned subsidiary of Verizon Communications, Inc.

Fourth Claim for Relief is for mistake and its Fifth Claim for Relief is for violation of Ohio Rev. Code § 1335.11. The Sixth Claim for Relief is for unjust enrichment, the Seventh is for promissory estoppel and the Eighth is for unconscionability, reformation and recision. MCI has asserted a counterclaim for attorneys' fees on CCS's Fifth Claim for Relief for violation of Ohio Rev. Code § 1335.11.

## MOTION FOR RECONSIDERATION

Pending is CCS's Motion for Reconsideration (doc. # 60) of this Court's Entry and Order overruling its Motion for Leave To File Substitute Partial Motion for Summary Judgment and Exhibits (doc. #58). Even after the summary judgment deadline was extended three times, CCS failed to file any depositions or exhibits with its Motion for Partial Summary Judgment. CCS's Motion for Partial Summary Judgment was filed on June 16, 2009.

On August 5, 2009, a month and a half later, unsigned depositions were filed, but without exhibits.[2] On August 10, 2009, almost two months after its Motion for Partial Summary Judgment was filed, CCS sought leave to filed a substitute motion for partial summary judgment to correct certain errors and omissions. CCS also sought leave to file exhibits. On August 19, 2009, this Court overruled CCS's Motion for Leave To File Substitute Partial Motion for Summary Judgment and Exhibits for the reasons more fully set forth in that Entry and Order. (Doc. #58.)

CCS now seeks reconsideration particularly of this Court's refusal to permit it to file its exhibits. The reasons given are that MCI does not object and that the exhibits are evidence the Court must consider.

---

[2] The deposition signature pages were then filed on August 19, 2009.

CCS's Motion for Reconsideration (doc. #60) is overruled for the reasons stated in the Entry and Order for which CCS is seeking reconsideration. Further, the exhibits that CCS wishes for the Court to consider are not, standing alone,[3] Rule 56 evidence. However, to the extent that the same exhibits have been properly presented by MCI as Rule 56 evidence, they will be considered.

## MOTIONS FOR SUMMARY JUDGMENT

CCS has made a Partial Motion for Summary Judgment (doc. #26) and MCI has made a Motion for Summary Judgment (doc. #25.) Both of these Motions are now fully briefed and ripe for decision. A relevant factual background will first be set forth followed by the standard of review for motions for summary judgment and an analysis of the pending motions.

## RELEVANT FACTUAL BACKGROUND

## CCS

CCS is a broker for and consultant to end-users of telecommunications services and equipment. (Deposition of Matthew A. Hippenmeyer ("Hipp. Dep.") 63 Apr. 27, 2009.) It offers a broad range of telecommunications services including system design and specification, preparation of requests for quotes or proposals, contract analysis, provider assessments and selections, audits of provider billings and project management. (Id. 70-77.) It also represents telecommunications carriers as a broker. (Id. 63, 65.)

CCS maintains direct or indirect "representation" relationships with virtually all telecommunications providers. (Id. 84, 323-24.) With these relationships, CCS has the ability to

---

[3]The exhibits were not submitted with an affidavit or deposition or any indication as to where, if at all, they had already been authenticated in an affidavit or deposition.

offer a wide array of telecommunications products and services. (Id.)

CCS is compensated for the services it provides to its clients in two ways. First, the client may pay CCS directly at an agreed upon amount. (Hipp. Dep. 38; Am. Compl. ¶ 4.) Second, in business relationships where CCS selects a provider and negotiates an agreement on behalf of a client, CCS may be indirectly compensated through a commission paid by the provider. (Hipp. Dep. 38; Am. Compl. ¶ 4.)

CCS was founded in 2002 by Matthew A. Hippenmeyer ("Hippenmeyer") who is its President and sole owner. (Id. 5, 63.) Until the Spring of 2005, Hippenmeyer was CCS's only employee. (Id. 61.)

Before forming CCS, Hippenmeyer worked in various sales positions for Cellular One, MCI and AT&T. (Id. 7-9.) When he resigned from AT&T to start CCS, he was AT&T's Sales Manager for the State of Ohio. (Id. 44.)

### CCS's Relationship With MCI - The Agreements

At the beginning of the relevant time period, MCI sold its products and services directly and through National Value Added Reseller Representation Agreements. (Deposition of John Rozinsky ("Rozinsky Dep.") 18 Apr. 15, 2009; Deposition of Brian H. Dolbier ("Dolbier Dep.") 25, 36-37 Mar. 30, 2009.) MCI direct sales were conducted by MCI sales representatives who were paid a salary and commissions on sales. (Dolbier Dep. 55.) Under a Value Added Reseller Agreement, sales commissions were paid to the reseller of MCI's services.

Sometimes MCI sales representatives would team with Value Added Resellers under a teaming arrangement. (Dolbier Dep. 37.) In teaming situations, both the Value Added Reseller and MCI sales representatives were paid commissions. (Hipp. Dep. 449.) Due to the added

commission expense, Value Added Resellers were required to be approved for teaming, and teaming approval was intended for a limited duration. (Deposition of Shelly Ashwill-Powers ("Ashwill-Powers Dep.") 31, 38-40 May 21, 2009.)

The VAR Agreement

On July 2, 2003, CCS entered into a Value Added Reseller Agreement with MCI (the "VAR Agreement"). (Def's Mot. Summ. J. Px. 81.) The VAR Agreement authorizes CCS to represent MCI as a value added reseller. (Id.) It authorizes CCS to obtain orders from its current and prospective customers for MCI's products and services and submit them to MCI for its acceptance or rejection. (Id.)

The VAR Agreement also provides that MCI will pay CCS commissions on orders submitted by CCS and accepted by MCI. (Id.) CCS is to receive monthly residual commission of 15% on Total Customers' Revenue and a one-time payment for New Billed Revenue of 70%. (Id.) The VAR Agreement further provides that MCI will continue to pay commissions to CCS after termination of the VAR Agreement so long as CCS's monthly Total Customers' Revenue exceeds $100,000. (Id.) These commissions are to cease the first month that CCS's amount is less than or equal to $100,000. (Id.)

The First Amendment To the VAR Agreement

In March of 2005, CCS and MCI executed an amendment to the VAR Agreement (the "VAR Agreement Amendment"). (Defs.' Mot. Summ. J. PX 85.) The VAR Agreement Amendment is effective as of January 1, 2005. (Id.) It provides for a residual commission on 409 Group, Inc.[4] accounts for MCI services under Contract No. 450265 of 5% for each month that

_____

[4]The 409 Group, Inc. was doing business as Check 'n Go ("CNG")

-5-

CCS is eligible for commission under the VAR Agreement. (Id.) It also provides that commissions on the 409 Group, Inc. accounts will cease upon the termination of the 409 Group, Inc. contract or per the terms of the VAR Agreement. (Id.) Finally, it provides that New Billed Revenue related to the 409 Group, Inc. contract will be considered for a one-time payment under the terms of the VAR Agreement at a rate of 25%. (Id.) The VAR Agreement Amendment indicates that it and the VAR Agreement is the complete agreement of the parties and supercedes any prior agreements or representations with respect to their subject matter. (Id.)

The SPA

In early 2005, MCI replaced existing VAR Agreements with Solution Provider Agreements. (Ashwill-Powers Dep. 13.) Thus, in February of 2005, CCS and MCI entered into a Solution Provider Agreement (the "SPA"). (Defs.' Mot. Summ. J. PX 84.) The SPA provides that,

> This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and all prior commissions agreements and representations of the parties regarding the subject matter hereof, whether written or oral, are merged herein and are of no further force or effect. This Agreement cannot be changed or modified except in a writing signed by a duly authorized officer of each party to this Agreement.

(Id.)

The SPA became effective on February 1, 2005. (Id.) Like the VAR Agreement, the SPA authorized CCS to obtain orders and submit them to MCI and provided that MCI would pay commissions based upon the submitted orders. (Id.) The SPA provides a 15% monthly commission rate on Total Customers Revenue for Non-Strategic and Strategic Products. (Id.) The SPA further provides that MCI will continue to pay commissions to CCS after termination of the VAR Agreement so long as CCS's monthly Total Customers' Revenue exceeds $25,000

per month. (Id.) These commissions are to cease the first month that the Total Customer Revenue attributable to CCS is less than or equal to $25,000. (Id.)

Paragraph 14 of Exhibit B of the SPA specifically addresses the VAR Agreement entered into between CCS and MCI and commissions that were to be paid under the VAR Agreement. (Id.) Paragraph 14 provides that:

> Upon the Effective Date of this Agreement, the National VAR Representation Agreement between MCI and Representative [CCS] signed by Representative on July 3, 2003 and assigned VAR/Agent ID VAR0040 by MCI (the "Terminated Agreement"), is hereby terminated and superseded by this Agreement. All terms and conditions will be considered null and void except that MCI will pay Representative under this Agreement a monthly residual commission on "Total Customers' Revenue" at the rates specified in the Terminated Agreement on the Effective Date of this Agreement. "Total Customer Revenue" will be considered "Contributing Revenue" under paragraph 5 of this Exhibit B of this Agreement and will be added to Total Customers' Revenue in Paragraph 8, however in no event will Contributing Revenue be commissioned under the table in Paragraph 8 of this Exhibit B. Following the Effective Date of this Agreement, Representative will no longer be eligible to any one-time payments that may have been included in the Terminated Agreement.

(Id.)

Special Amendment To the SPA

In April of 2005, CCS and MCI entered into a Special Amendment To the SPA. (Defs.' Mot. Summ. J. PX 94.) The effective date of this special amendment is April 27, 2005. (Id.)

The Special Amendment To the SPA provides that, in the event CCS executes the SPA and the signed SPA is received by MCI on or before April 30, 2005, CCS will be eligible to participate in the "2005 Revenue Challenge Contest." (Id.) The Special Amendment was only offered to "Current Solution Providers" defined as a Representative under a MCI Solution Provider Agreement who had a commission agreement with MCI immediately prior to the effective date of the Solution Provider Agreement and had more than $2,500 in commissionable

revenue on existing MCI commission agreements on December 31, 2004. (Id.)

First Amendment To the SPA

In May of 2005, CCS and MCI entered into an agreement termed the "First Amendment To the Service Provider Agreement." (Defs.' Mot. Summ. J. PX 92.) This agreement is effective May 1, 2005. (Id.) Although the SPA is termed a <u>Solution</u> Provider Agreement and this is termed an amendment to the <u>Service</u> Provider Agreement, presumably this agreement is an amendment to the SPA (the "First Amendment To the SPA").

The First Amendment To the SPA deletes paragraph 14 of Exhibit B of the SPA and replaces it with a new paragraph 14. (Id.) The new paragraph 14 again terminates the VAR. (Id.) It also provides that MCI will pay CCS a monthly residual commission on Total Customers' Revenue at rates specified in the VAR. (Id.) Total Customer Revenue is considered "Contributing Revenue" under the SPA and is added to Total Customers' Revenue under the SPA to determine the applicable Residual Commission Percentage to be applied to Total Customers' Revenue in the SPA. (Id.) However, Contributing Revenue will not be commissioned under the table in Paragraph 8 of Exhibit B to the SPA. (Id.) Finally, the First Amendment To the SPA provides that CCS will no longer be eligible for any one-time payments that may have been included in the VAR except for one-time payments on orders accepted by MCI prior to the effective date of the SPA which CCS otherwise would have been eligible for under the terms of the VAR. (Id.)

Second Amendment To The SPA

Next, CCS and MCI entered into the Second Amendment To the SPA. (Defs.' Mot. Summ. J. PX 93.) CCS signed this agreement on July 19, 2005, and MCI signed this agreement

on September 26, 2005. (Id.) The Second Amendment To the SPA is effective September 1, 2005. (Id.) The Second Amendment To the SPA provides that, for the 409 Group, Inc. accounts only, "New Billed Revenue," as defined in the VAR, will be calculated on the fifth month's invoice and not on the second month's invoice. (Id.) It also provides that one-time payments related to New Billed Revenue for the 409 Group, Inc. accounts will be calculated based on a rate of 25%, as provided for in the First Amendment To the VAR, and not on the percentage represented in the VAR. (Id.)

Third Amendment To the SPA

Next, near the end of 2005, CCS and MCI entered into the Third Amendment To the SPA. (Defs.' Mot. Summ. J. DX L.) The Third Amendment To the SPA is effective January 1, 2006. (Id.)

The Third Amendment To the SPA provides a one-time payment of $6,752.37 from MCI to CCS for commissions on 254 specific MCI customer accounts for the 409 Group, Inc. (Id.) The payment is for commissions previously withheld for August, September and October of 2005. (Id.)

Termination of the SPA

The SPA provides that either party may terminate it without cause upon ninety (90) day written notice to the other. The SPA was terminated by MCI effective December 31, 2006. (Hipp. Dep. 199-200; Defs.' Mot. Summ. J. DX N.) After termination of the SPA, if CCS wanted to specify MCI products or services for its clients, it did so through Microcorp, a "master agent" located in Marietta, Georgia. (Hipp. Dep. 84, 323.)

Settlement Agreement and Release

Next, CCS and MCI entered into a Settlement Agreement. (Defs.' M. Summ. J. DX O.) This agreement was executed by MCI on July 25, 2007, and by CCS on August 1, 2007. It required a one-time payment of $16,705 from MCI to CCS to settle a dispute arising under the SPA related to commissions on customer accounts for Illinois Tool Works for the period October 1, 2006 through March 31, 2007.

## CCS's Relationship With CNG

While Hippenmeyer was working at AT&T, he developed a business relationship with the 409 Group, Inc. (Hipp. Dep. 45-51.) As indicated above, at all times relevant, the 409 Group, Inc. was doing business as Check 'n Go ("CNG"). CNG is in the "payday" loan business and in early 2003 had over 700 locations in the United States. (Id. 320.) CNG became a customer of AT&T in the late 1990's, around the time Hippenmeyer became AT&T's Ohio Sales Manager. (Id. 44-45.)

While working at AT&T, Hippenmeyer met Christopher Santangelo ("Santangelo") who became CNG's Chief Information Officer in 2000. (Id. 50-51.) In that position, Santangelo had overall responsibility for CNG's information technology. (Id.)

At the time, CNG purchased all of its local and long distance telephone service from AT&T. (Id. 45-51, 298-306.) In 2001, CNG purchased a data connectivity system from AT&T for its business locations in the southeastern United States. (Id. 300-05.)

As AT&T's Ohio Sales Manager, Hippenmeyer learned much about CNG's telecommunications needs and the process whereby CNG made its decisions. (Id. 307-08.) After he resigned from AT&T and started CCS in 2002, Hippenmeyer contacted Santangelo seeking to obtain business from CNG. (Id. 311-12.)

Initially, Santangelo was reluctant to retain CCS as CNG's telecommunications consultant because CCS was a new company with no track record. (Id. 311-13.) However, in 2003, Santangelo requested that Hippenmeyer prepare and submit a data connectivity solution for CNG's facilities in Michigan. (Id. 312-15.) This proposition, however, was ultimately rejected by CNG. (Id. 334-36.)

In the Spring of 2004, CNG contacted Hippenmeyer about a data network for its California locations. (Id. 369-71.) Hippenmeyer decided to propose MCI as the provider because MCI had more to offer than others and because he believed that MCI's Cincinnati Branch Office would be a helpful resource. (Id. 332-33.)

When MCI realized the size of the CNG opportunity, MCI required CCS to enter into a "teaming" arrangement whereby CCS would work with MCI's direct sales channel to sell services and equipment to CNG. (Id. 341.) The MCI sales employees assigned to CNG were James Schmitt ("Schmitt"), Account Manager, and Brian Dolbier ("Dolbier"), Sales Manager. (Dolbier Dep. 18-20.)

Throughout the Spring and Summer of 2004, Schmitt negotiated with Santangelo and Hippenmeyer over pricing issues and other contract provisions. (Hipp. Dep. 377-406.) By late August of 2004, MCI and CNG had reached an agreement in principal on price and service. (Id. 402-05.) An executable contract was delivered to Santangelo at the end of August or early September of 2004. (Id. 405-07.)

On August 16, 2004, there was a management change in the Information Technology Department at CNG. (Deposition of Rahul Bawa ("Bawa Dep.") 5, 14-15 May 28, 2009.) Rahul Bawa ("Bawa") became the Chief Information Officer and Santangelo reported to him. (Id. 14-

15.) Bawa undertook responsibility for negotiating with MCI. (Id. 18.)

For several weeks there were no discussions regarding the proposed agreement. (Hipp. Dep. 422.) In an attempt to move things along, Hippenmeyer arranged a meeting with Bawa and MCI representatives. (Id. 433.)

The meeting was held on October 8, 2004. (Id.) At that meeting, Hippenmeyer took credit for the AT&T arrangement that CNG still had in place. (Id. 435-38.) Bawa responded that "CNG hated AT&T and felt they had been taken advantage of by AT&T," and that "the AT&T contract was "unfavorable." (Hipp. Dep. 433-34; Bawa Dep. 34-35.) Bawa then complained about MCI's proposed prices, indicated that he wanted to consider different technology and deemed the previously submitted contract unacceptable because it omitted penalties on MCI for service disruptions. (Hipp. Dep. 437-43.)

At about that same time, Bawa told Michael Smith, an MCI Vice President, that the proposed contract was unacceptable, that he wanted to deal with MCI at the executive level, that he saw no value in CCS and that he did not want CCS involved in any capacity. (Bawa Dep. 20-21, 37, 42.) MCI had told Bawa that if CCS was no longer involved, MCI could offer CNG a pricing advantage. (Bawa Dep. 23, Dolbier Dep. 100.) MCI then told Hippenmeyer that Bawa did not want CCS involved and that he should no longer contact Bawa. (Hipp. Dep. 478-79.)

Throughout mid and late October of 2004, Hippenmeyer repeatedly tried to schedule a meeting with Bawa. (Id. 468-70.) They finally met on October 22, 2004. (Id. 480.) At this meeting, Bawa told Hippenmeyer that, if CCS was not involved, CNG could obtain a lower price and his job was to get the lowest possible price for CNG. (Id. 480-81.) Bawa saw no value in CCS and had a fundamental business philosophy against the use of brokers and other

middlemen. (Bawa Dep. 20, 21, 32-33, 42.)

Hippenmeyer never again met with Bawa. (Hipp. Dep. 482-83.) Further, CCS has not functioned as CNG's consultant or broker since October of 2004. (Id. 484.) Finally, CCS had no involvement in the negotiations or contract drafting between MCI and CCS which occurred throughout October and November of 2004 and which resulted in the agreement between MCI and CCS that was executed on December 2, 2004. (Hipp. Dep. 485-87; Bawa Dep. 7, 41.) This agreement, termed the Master Services Agreement ("MSA") governed all future orders of MCI products sold to CNG. (Rozinsky Dep. 30, Hipp. Dep. 98.)

### Controversy Regarding Compensation To CCS

Following execution of the MSA with CNG in December of 2004, there was internal controversy at MCI as to what, if any, commissions should be paid to CCS on the CNG account. (Dolbier Dep. 109-113.) John Rozinsky ("Rozinsky"), VAR Channel Manager assigned to CCS, had reminded Hippenmeyer to make sure the CCS VAR code was on all CNG orders. (Rozinsky Dep. 71-72, PX 69.) As the CCS VAR Channel Manager, Rozinsky was entitled to receive commissions on sales credited to CCS. (Rozinsky Dep. 47-48.) Rozinsky's understanding was that CCS would be compensated on the CNG account as provided under the VAR for orders placed by CNG under the MSA. (Rozinsky Dep. 31.)

Discussions continued as to how much in commissions should be paid to CCS. (Dolbier Dep. 109-113.) Dolbier did not think that MCI had any contractual obligations to pay commissions to CCS but thought that MCI had a moral obligation to pay commissions. (Id. 113.) Consideration was also given to paying CCS the 70% bonus required under the VAR but MCI's Business Development would not, at the time, support the 70% up-front payment on the second

month billing. (Rozinsky Dep. 74-75, PX 43.)

Michael P. Smith ("Smith"), a MCI Regional Vice President of the Business Commercial Solutions Division of MCI felt that MCI was not contractually obligated to pay CCS for CNG's business because CCS was no longer working with CNG. (Affidavit of Michael P. Smith ("Smith Aff.") ¶ 7 June 1, 2009.) According to Smith, the decision to compensate CCS "reflected MCI's desire to acknowledge CCS's efforts with respect to CNG prior to its hiring Mr. Bawa and disengaging CCS." (Id.)

In December of 2004, Rozinsky told Hippenmeyer that MCI had decided to reduce the CNG commission rate to 5% and the second month bonus payment to 25%. (Rozinsky Dep. 39-40, 96.) Rozinsky also informed Hippenmeyer that these new rates were not negotiable and that he would not have to call CNG or do any work with CNG on behalf of MCI. (Rozinsky Dep. 40, 96; Hipp. Dep. 490.) The VAR was amended to reflect these changes. With Rozinsky's assurances, Hippenmeyer signed the Amended VAR. (Hipp. Dep. 114-15.)

The VAR was amended in March of 2005 retroactive to January 1, 2005. (Defs.' Mot. Summ. J. PX 85.) The SPA was executed in February of 2005, prior to when the VAR was amended, but was effective February 1, 2005, after the effective date of the VAR Agreement Amendment. (Defs.' Mot. Summ. J. PX 84.) The SPA declared the terms of the VAR Agreement null and void. (Id.)

Since the VAR Agreement was amended, it was necessary to issue a new VAR code for CCS for CNG's account. (Deposition of Cheryl Reiter ("Reiter Dep.") 80 May 20, 2009.) Apparently this was accomplished.

In May of 2005, the Parties entered into the First Amendment to the SPA which

terminated and superceded the Amended VAR. (Defs.' Mot. Summ. J. PX 92.) The First Amendment to the SPA preserves the obligation of MCI to pay CCS the 5% residual commission rate on CNG Total Customer Revenue and eliminates MCI's obligation to pay the second month bonus for orders placed after the effective date of the SPA. (Id.)

The purpose of the Amended VAR followed by the First Amendment to the SPA was to permit CCS to be paid the 5% residual commission on CNG revenues even though CNG orders were submitted by the MCI direct sales channel. (Rozinsky Dep. 58; Reiter Dep. 20, 82, 84.) Even though the VAR Agreement and the SPA both require the VAR to place orders in order to receive residual commissions, MCI's practice under teaming was to pay VARs for orders placed by MCI's direct sales channel provided the orders were tagged with the VAR code. (Rozinsky Dep. 72, Reiter Dep. 19-20, 22-23, 34-35; Ashwill-Powers Dep. 27, 31, 34, 90.)

Some CNG orders were not tagged with CCS's VAR code. (Reiter Dep. 37.)  Reiter would then check to see if those orders were submitted under the teaming arrangement. (Id.) She does not remember any specifics as to whether VAR codes were to be added, she has never been asked to verify whether CCS was compensated for CNG orders while the teaming arrangement was in place and she is not sure if the records still exist for her to be able to check. (Id. 37-40.)

In early 2005, MCI decided to reduce teaming and drive more single accountability for sales to either the VAR or MCI. (Ashwill-Powers Dep. 17.) The reason for reducing teaming was to strengthen MCI's financials. (Id.) However, teaming was again approved for CCS on the CNG account. (Defs.' Resp. In Opp'n PX 73.)

MCI and CCS were expecting additional orders from CNG in August and September of 2005. (Reiter Dep. Ex. 118.) In September of 2005, CNG agreed to convert 575 sites from Mega

Path and AT&T to MCI. (Deposition of James C. Schmitt ("Schmitt Dep.) PX 53 Mar. 31, 2009.)

Also, in September of 2005, whether teaming would continue with CCS on the CNG orders became an issue. (Ashwill-Powers Dep. 38-39, 57.) Teaming was not for an indefinite period and required re-approval every three or four months. (Id.) Typically, teaming would end as the result of the lack of involvement of the VAR or if the customer bought services directly from MCI. (Id. 39.)

In September of 2005, Patricia Flynn of MCI wanted to end the teaming arrangement between CCS and MCI on the CNG orders. (Id. 57.) Hippenmeyer attempted to resolve the issue and met with Rozinsky, Bloom and Ashwill-Powers while attending the Chicago Exposition in September of 2005. (Hipp. Dep. 217-18.) However, on September 22, 2009, MCI told CCS that, effective October 1, 2009, it would no longer accept orders from CCS, submitted on behalf of CNG, for MCI services. (Hipp. Dep. 219, PX 99.) In a letter dated November 29, 2005, the effective date was extended to November 1, 2005. (PX 143.) After November 1, 2005, CCS continued to be paid commissions for CNG revenues from some orders that had been placed prior to that date. (Rozinsky Dep. PX 105, 106.)

CCS also continued its relationship with MCI on other accounts. (Hipp. Dep. 249-50.) In the Fall of 2006, CCS placed a master services agreement with MCI for the Henny Penny account. (Id.) The Henny Penny orders were placed immediately thereafter. (Id.)

MCI terminated the SPA effective December 31, 2006. (Hipp. Dep. Ex N.) The termination letter indicates that the termination was without cause and that Hippenmeyer would be paid commissions due pursuant to the SPA up until the termination date. (Id.)

Hippenmeyer believes that the termination was based upon not wanting to pay CCS commissions on the CNG account. (Hipp. Dep. 194-95.) Rozinsky was not aware of any reason for the termination and believed that CCS was removed from the CNG account because MCI did not see any value in CCS servicing the account and because teaming was a high-cost way for MCI to do business. (Rozinsky Dep. 140.)

Following an email requesting payment, Reiter investigated and determined that MCI accepted the Henny Penny orders in 2007. (Reiter Dep. 127.) Hippenmeyer has never received full payment for orders placed on the Henny Penny account. (Hipp. Dep. 255-56.)

Throughout the Summer and Fall of 2005, Hippenmeyer raised a dispute with various MCI employees over his concerns with CNG commissions. (Hipp. Dep. 209.) On October 18, 2007, Hippenmeyer disputed the CNG commissions in writing. (Id. 208.) CCS was paid commissions for CNG revenues from some orders placed prior to November 1, 2005, but was not paid commissions for CNG orders placed thereafter.

MCI determined that the SPA Agreement with CCS was terminated effective December 31, 2006. On January 14, 2008, the Complaint that forms the basis for the lawsuit that is now before the Court was filed.

## STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that

party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

In addition to applying the federal procedural standard for motions for summary judgment, as a federal court located in Ohio exercising diversity jurisdiction, this Court must apply Ohio substantive law unless the law of another state is specifically implicated. *Hisrich v. Volvo Cars of N. America, Inc.*, 226 F.3d 445, 449 (6th Cir. 2000). This Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of

the state.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001)(quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998)).

To the extent that the highest court in Ohio has not addressed the issue presented, this Court must ascertain from all available data, including the decisional law of Ohio's lower courts, what Ohio's highest court would decide if faced with the issue. *Id.; Bailey v. V & O Press Co., Inc.*, 770 F.2d 601, 604 (6th Cir. 1985). Finally, where Ohio's highest court has not addressed the issue presented, a federal court may not disregard a decision of an Ohio appellate court on point unless the federal court is convinced by other persuasive data that the highest court of Ohio would decide otherwise. *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir. 1989).

The agreements at issue in the case provide that they are to be governed and construed in accordance with the laws of the State of New York. Both parties cite to both Ohio and New York law and the law in both states is the same relevant to the issues before the Court. Therefore, the Court will cite to Ohio law.

## ANALYSIS OF MOTIONS FOR SUMMARY JUDGMENT

CCS seeks summary judgment on its breach-of-contract and violation-of-R.C. § 1335.11 claims. MCI seeks summary judgment on all of CCS's claims and on its counterclaim. Therefore, each of CCS's claims and MCI's counterclaim will be addressed.

### Breach of Contract

CCS argues that the terms of the VAR Agreement and the SPA do not apply to teaming arrangements, that the Amended VAR Agreement requires MCI to pay CCS a commission based upon CNG revenues and that MCI has not paid the commissions due on the CNG revenue. CCS

also argues that MCI has not paid commissions due on the Henny Penny account.

MCI argues that the clear language of the VAR Agreement and the SPA provides that MCI is obligated to pay commissions only for orders submitted by CCS to MCI and that CCS submitted no orders to MCI for or on behalf of CNG. MCI also argues that the SPA provides that MCI's obligation to pay commissions after the SPA terminates ceases as soon as "Total Customers' Revenue are $25,000 or less and the "Total Customers' Revenue" never exceeded $25,000 after termination of the SPA.

Legal Provisions

To satisfy a breach-of-contract claim, a plaintiff must show that (1) a contract existed; (2) the plaintiff fulfilled his or her obligations; (3) the defendant failed to fulfill his or her obligations; and (4) damages resulted from this failure. *Ligman v. Realty One Corp.*, No. 23051, 2006 WL 2788598 at * 1 (Ohio Ct. App. Sept. 29, 2006). The Parties do not dispute that the contracts at issue exist. Thus, resolution of this claim involves interpretation of the contracts to determine if obligations were satisfied.

In Ohio, the interpretation of a contract is a matter of law for the court. *O'Neil v. Kemper Insurance Companies*, 497 F.3d 578, 582 (6th Cir. 2007). Further, where both parties are commercial enterprises of sufficient size and quality, they presumably possess a high degree of sophistication in matters of contract. *The Prudential Insurance Co. of America v. Corporate Circle, Ltd.*, 658 N.E.2d 1066, 1069 (Ohio Ct. App. 1995).

If terms of the contract are clear and unambiguous, they are to be given the effect called for by the plain language of the contract. *O'Neil,* 497 F.3d at 582. If the terms of the contract are not clear and unambiguous, the court may consider extrinsic evidence. *Id.* at 583(citing *Shifrin v.*

*Forest City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio 1992)). However, if no ambiguity appears on the face of a contract, extrinsic evidence is not considered in an effort to demonstrate an ambiguity. *Shifrin*, 597 N.E.2d at 501. Finally, contract interpretation becomes a question of fact when extrinsic evidence is needed to interpret the contract's meaning. *Maverick Oil & Gas, Inc. v. Board of Education of Barberton City School District*, 872 N.E.2d 322, 329 (Ohio Ct. App. 2007).

There are multiple contracts involved in this matter. Ohio courts generally construe multiple documents together if they concern the same transaction. *Prudential*, 658 N.E.2d at 1069. When construing multiple documents, effect is given to every provision of every writing. *Id.*

Analysis

In this case, neither Party has identified an ambiguity in any of the contracts and the Court is aware of none. Therefore, the Court will proceed to interpret the contracts at issue as a matter of law.

Further, both Parties agree that the plain language in the VAR Agreement and the SPA, and the amendments thereto, does not provide for payment of commissions on orders that are not submitted by the Value Added Reseller, CCS in this case. However, CCS argues that the course of dealing, the course of conduct and the course of performance by the Parties shows that MCI paid commissions to CCS on CNG orders not submitted by it but submitted by MCI direct sales. Thus, according to CCS, the course of dealing, course of performance and the course of conduct of the parties shows that MCI intended, under the VAR Agreement and the SPA, to pay commission on CCS orders submitted Therefore, the Court must decide whether the courses of

conduct, dealing and performance may be considered when the terms of a contract are unambiguous.

First, definitions of the terms course of conduct, course of dealing and course of performance are needed to see which, if any, apply. A course of performance is the understandings which develop by conduct without objection between two parties during the performance of a contract. *Lincoln Electric Co. v. St. Paul Fire and Marine Insurance Co.*, 210 F.3d 672, 686-87 (6th Cir. 2000). A course of conduct is a series of acts over a period of time evidencing a continuity of purpose. *Id.* A course of conduct may extend from a time previous to initial contract formation to a time subsequent to contract formation. *Id.* at n.15. Course of dealing is a sequence of conduct between two parties that occurs prior to entering into a contract. *Id.*

Thus, course of dealing refers to actions that take place prior to the formation of a contract and course of performance refers to actions that take place after the formation of a contract. Course of conduct may refer to actions both before and after a contract is formed.

CCS presents no evidence or argument regarding the payment of commissions by MCI prior to the formation of the VAR Agreement and SPA. Therefore, CCS's arguments are in regard to actions taken by MCI after formation of the VAR Agreement and SPA and are, therefore, arguments regarding either the course of performance or the course of conduct.

A valid "written changes only" provision preempts consideration of course of performance. *Lincoln Electric*, 210 F.3d at 687. The contracts at issue include "written changes only" provisions. Thus, the course of performance may not be considered.

The course of conduct can be considered notwithstanding the presence of a "written

changes only" provision but only as evidence of the continuity of purpose captured by the original contract terms at the time of contract formation. In this case, there is no need for evidence of a continuity of purpose because the original contract terms are unambiguous and generally not disputed.

Extrinsic evidence may also be considered before an ambiguity is identified if it can assist the court in determining whether, as a matter of law, two plausible interpretations exist that may give rise to an ambiguity. *Lincoln Electric*, 210 F.3d at 684. However, extrinsic evidence is not needed in this case for this purpose since there is no ambiguity and no argument that an ambiguity exists.

The Sixth Circuit has determined that, when the terms of the contract are clear on their face, there is no need to construe the evidence otherwise. *Lincoln Electric*, 210 F.23d at 683. Further, the Ohio Supreme Court has said that courts are to presume that the intent of the parties to a contract is found in the language they chose to use in the contract and, unless contract terms are ambiguous, courts should not, in effect, create a new contract by finding an intent not expressed in the clear language used in the contract. *Shifrim*, 597 N.E.2d at 501. If there is no ambiguity on the face of a contract, extrinsic evidence may not be used to show an ambiguity. *Id.*

CCS cites four cases for the proposition that the Court should consider the Parties' course of performance. However, none are persuasive.

CCS first cites *Lynn v. Purcell*, 812 N.Y.S.2d 760 (N.Y. Sup. Ct. 2005). However, when it said that "the practical interpretation of a contract by the parties… is deemed of great if not controlling influence," the *Lynn* Court was referring to the interpretation of contract language regarding a Fee Agreement that it found to be ambiguous. *Id.* at 763.

CCS then cites *Feinberg v. Federated Department Stores, Inc.*, 832 N.Y.S.2d 760 (N.Y. Sup. Ct. 2007). However, when it said that extrinsic evidence could be considered, the *Feinberg* Court was using extrinsic evidence to explain or supplement written agreements. *Id.* at 763. In this case, there is no need to explain or supplement unambiguous contract terms. Also, the *Feinberg* court relied upon UCC 2-202 as adopted by the State of New York. However, the official comments to this section of the UCC indicate that an original determination that the language used is ambiguous is a "condition precedent" to the use of evidence regarding course of dealing, usage of trade or course of performance. N.Y. Uniform Commercial Code § 2-202 (2009 Electronic Update), official comment 1(c). In this case, no ambiguity has been found.

The next case cited by CCS is *Automated Solutions Corp. v. Paragon Data Systems, Inc.*, 856 N.E.2d 1008, (Ohio Ct. App. 2006). However, in *Automated Solutions*, the Court was considering whether a contract had been repudiated and was addressing waiver in the context of a party's failure to enforce its rights to renew a previous contract. In this claim, waiver is not being argued or considered nor is the untimely renewal of a contract being argued or considered.

The final case cited by CCS is *McLaughlin v. Sandlin*, No. 7257, 1981 WL 2567 (Ohio Ct. App. Oct. 14, 1981). However, the *McLauglin* court was considering a property description in a contract to sell property that was ambiguous to the extent that it was incorrect. In this case, as indicated above, there is no ambiguity.

The VAR Agreement and the SPA are clear and unambiguous. They require MCI to pay commissions to CCS on orders placed by CCS and say nothing about commissions on orders placed by MCI Direct Sales.

CCS next argues that the VAR Agreement Amendment requires payment to CCS of

-25-

commissions on CNG revenue. According to CCS, the mechanism for payment of CCS commissions shifted from orders submitted by the Value Added Reseller to revenues generated on the CNG account.

However, a plain reading of the VAR Agreement together with the VAR Agreement Amendment reveals otherwise. The VAR Agreement Amendment merely reduced the commission percentage on CNG revenues.

The VAR Agreement Amendment provides that, absent explicit modification, the meanings of any defined terms and the legal and binding obligations of CCS and MCI as set forth in the VAR Agreement remain unchanged. The VAR Agreement provides that commissions are to be paid on orders submitted by CCS, and this is not changed by the VAR Agreement Amendment. The only relevant matter that was changed by the VAR Agreement Amendment was the commission rate paid to CCS. Regarding the commissions due CCS on the CNG account, there are no genuine issues of material fact and MCI is entitled to judgment as a matter of law.

CCS's final argument on its breach-of-contract claim is that MCI has unlawfully refused to pay commissions on revenues generated by CNG orders that were not tagged to CCS and on orders placed by CCS on the Henny Penny account. The orders that were not tagged to CCS are presumably orders submitted by MCI Direct Sales and CCS, as indicated above, has not shown that MCI breached any of the contracts regarding those orders. This final argument turns, then, on whether MCI has refused to pay commissions due on the Henny Penny account.

The Henny Penny orders in question were allegedly submitted by CCS prior to the termination of the SPA on December 31, 2006 and the orders were alleged accepted by MCI in

2007. Paragraph 5.1 of the SPA provides that MCI will pay commissions on revenue from orders submitted. Paragraph 2i of Exhibit B to the SPA provides, among other things, that Customer Revenue is monthly charges less any credits and/or discounts for MCI services commissionable on an order submitted during the term of the SPA. No mention is made in either section of the SPA of acceptance being required. Thus, the SPA provides that MCI must pay commission on the Henny Penny orders placed by CCS prior to expiration of the SPA.

MCI argues that MCI provided no services to Henny Penny until after the SPA terminated. However, the payment of commission is based upon when and by whom the order was submitted and not by when the services are provided.

The SPA was terminated on December 31, 2006, but provides for residual commissions to continue after termination provided that CCS's monthly Total Customers' Revenue exceeds $25,000. Therefore, It is clear from the terms of the SPA that CCS was due residual commissions on orders that CCS submitted on the Henny Penny account prior to termination of the SPA on December 31, 2006.

Further, there is Rule 56 evidence that CCS submitted orders on the Henny Penny account prior to December 31, 2006. (See Hipp. Dep. 249.) However, the Rule 56 evidence on whether or not CCS has been paid residual commissions on the Henny Penny and other accounts after the SPA was terminated is, at best, confusing.

Hippenmeyer was asked at his deposition dated April 27, 2009, "excluding CNG, was there any month after December 31 of 2006 when CCS had a total customers revenue which exceeded $25,000?" (Hipp. Dep. 252.) He responded, "I – I haven't looked at it that way so I would have a hard time answering although I would say if you included Henny Penny, no." (Id.

252-53.) Shortly thereafter in his deposition, Hippenmeyer was asked where he got the information that CCS's total billing had dropped below the 25,000-dollar mark. (Id. 255.) He responded, in part, "I have not done an audit of that conclusion because I cannot get into the systems of which to pull down the details associated with that so I don't know whether to accept or refute that – had you paid Henny Penny as we agreed upon, and – then – I would have never fallen below that rate because Henny Penny would put me over the evergreen of 25,000." (Id.) In an Affidavit dated May 15, 2009, after his deposition, Hippenmeyer attests, "[i]n July 2008, MCI stopped paying any commissions on all accounts. Based on commission statements provided by MCI, the monthly average Total Customer Revenue was over $76,000, excluding CNG revenues, when MCI stopped paying commissions. MCI has never provided CCS with a statement indicating Total Customer Revenue had been less than $25,000 in any month. (Affidavit of Matthew Hippenmeyer ¶ 2 May 15, 2009.) Further, MCI has identified no Rule 56 evidence beyond excerpts from Hippenmeyer's deposition, that CCS is not due any residual commissions after termination of the SPA. There are genuine issues of material fact and neither party is entitled to judgment as a matter of law on the claim that MCI has breached the SPA with regard to payment of residual commissions on accounts, other than the CNG account.

MCI also seeks summary judgment on what it terms the "security surcharge claim." CCS makes no mention of this claim in its Partial Motion for Summary Judgment nor does CCS respond to this assertion in its Memorandum Contra MCI's Motion for Summary Judgment.

MCI argues that there is no mention of a "security surcharge" in either the VAR Agreements or the SPA and that Hippenmeyer admitted that CCS has no basis for that claim. Hippenmeyer asserts that the "security surcharge" is addressed in paragraph 7 on page 11 of the

SPA and in paragraph 5 on page 14 of the VAR Agreement. (Hipp. Dep. 263.) Both of these paragraphs provide that the term "Total Customer Revenue" means the cumulative Customer's Revenue eligible for commission that is reduced by 5%. Both of the paragraphs cited also include the following sentence, "MCI reserves the right, at its sole discretion, to reduce further the Total Customer Revenue in the event of fraud, extraordinary event, bad debt, changes in federal, state or local regulatory rules or orders." However, neither of these paragraphs mention a "security surcharge." Further, Hippenmeyer was unable to identify any language in the VAR Agreement or the SPA that requires MCI to pay CCS commissions on 100% instead of 95% of the Customer's Revenue eligible for commission. (Hipp. Dep. 263-64.) Therefore, there are no genuine issues of material fact and MCI is entitled to judgment as a matter of law on CCS's claim that a "security surcharge" should be refunded.

### Fraudulent Inducement

A fraudulent-inducement claim arises when a party is induced to enter into an agreement through fraud or misrepresentation. *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 578 (Ohio 1998). The fraud relates to the facts inducing the execution of the contract. *Id.* A fraudulent inducement claim regarding a contract generally involves a misrepresentation of facts outside the contract or other wrongful conduct inducing a party to enter into the contract. *Resource Title Agency, Inc. v. Morreale Real Estate Services, Inc.*, 314 F. Supp.2d 763, 774 (N.D. Ohio 2004).

To prove fraud in the inducement, a plaintiff must prove that the defendant made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to his or her detriment. *ABM Farms*, 692 N.E.2d at 578. A party claiming fraudulent inducement must prove by a preponderance of the evidence

that, at the time the promise to perform was made, the promisor did not intend to fulfill the promise. *Resource Title*, 314 F. Supp.2d at 775.

Generally, when a fraud consists of a misrepresentation as to the terms of a contract, the claim will fail if the true meaning of the contract can be ascertained by reading the contract. *Gentile v. Ristas*, 828 N.E.2d 1021, 1033 (Ohio Ct. App. 2005). Said another way, the terms of a contract preclude a party from claiming that it had been misled into signing the contract. *Diamond Wine & Spirits, Inc. V. Dayton Heidelberg Distributing Co., Inc.*, 774 N.E.2d 775, 775 (Ohio Ct. App. 2002). Said a third way, "[a] person of ordinary mind cannot… be heard to say he was misled into signing a contract that was different from what he intended when he knew or could have known the truth merely by reading what he signed." *Id.* at 779.

MCI argues that it is entitled to summary judgment on CCS's fraudulent inducement claim because MCI made no misrepresentation. Even if a misrepresentation was made, MCI argues that CCS did not justifiably rely upon it.

CCS responds that MCI fraudulently induced CCS to sign the VAR Agreement Amendment and the First Amendment To the SPA by concealing and misrepresenting their purpose. When CCS signed the VAR Agreement Amendment, it was, according to CCS, with the assurance that the purpose of the amendment was for CCS to receive commissions on the CNG account. Also, according to CCS, when it signed the First Amendment To the SPA, it was assured that the purpose of this amendment was to change the bonus month. Finally, CCS also responds that MCI committed fraud because it has concealed CNG orders and sales revenues upon which CCS is to be paid commissions.

In this case, the alleged frauds relate to the terms of two contracts. The language of both

VAR Agreement Amendment and the First Amendment To the SPA is clear and unambiguous and there is no evidence that Hippenmeyer is not a person of "ordinary mind." Therefore, Hippenmeyer knew or could have known the contents of the VAR Agreement Amendment and the First Amendment To the SPA by merely reading what he signed before he did so.

In addition, the VAR Agreement, the VAR Agreement Amendment and the SPA are all "fully integrated." All three contain a provision that the agreement constitutes the entire agreement between the parties with respect to its subject matter and all prior commission agreements and representations of the parties regarding the subject matter, whether written or oral, are merged into the agreement and are of no further force or effect.

Hippenmeyer can hardly be heard to say that he was fraudulently misled into signing the VAR Agreement Amendment and the First Amendment To the SPA. Therefore, there are no genuine issues of material fact and MCI is entitled to judgment as a matter of law on CCS's Second Claim for Relief for fraudulent inducement.

### Negligent Misrepresentation

The law of misrepresentation protects a plaintiff's interest in making business judgments without being misled by others into making unwise decisions that result in financial loss. *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 505 (6th Cir. 2003). Liability for negligent misrepresentation arises when a person who, in the course of business or in any other transaction in which the person has a pecuniary interest, supplies false information for the guidance of others in their business transactions if the person fails to exercise reasonable care or competence in obtaining or communicating the information. *Gentile*, 828 N.E.2d at 1039(citing *Delman v. City of Cleveland Heights*, 534 N.E.2d 835 (Ohio 1989)). However, as with a claim of fraudulent

misrepresentation, "[a] person of ordinary mind cannot… be heard to say he was misled into signing a contract that was different from what he intended when he knew or could have known the truth merely by reading what he signed." *Diamond Wine and Spirits*, 774 N.E.2d at 779.

Whether or not the person used reasonable care in obtaining or communicating information is a question for the jury, unless the facts are so clear to permit only one conclusion. *Id.* at 1040. Further, a plaintiff must show that the misrepresentation upon which he or she justifiably relied was material. *Andersons*, 348 F.3d at 506. In addition, damages are measured by the loss caused by justifiable reliance upon the information. *Gentile*, 828 N.E.2d at 1039. Finally, a negligent misrepresentation claim does not lie for omissions, there must be an affirmative false statement. *Id.* at 1040.

As with CCS's fraudulent inducement claim, MCI argues that it is entitled to summary judgment on CCS's negligent misrepresentation claim because MCI made no misrepresentation. Even if a misrepresentation was made, MCI argues that CCS did not justifiably rely upon it.

Also, as with its fraudulent inducement claim, CCS responds that MCI fraudulently induced CCS to sign the VAR Agreement Amendment and the First Amendment To the SPA by concealing and misrepresenting their purpose. When CCS signed the VAR Agreement Amendment, it was, according to CCS, with the assurance that the purpose of the amendment was for CCS to receive commissions on the CNG account. Also, according to CCS, when it signed the First Amendment To the SPA, it was assured that the purpose of this amendment was to change the bonus month.

Not surprisingly, the result is the same with this claim as with CCS's fraudulent inducement claim. The fraud, or misrepresentation, relates to the terms of two contracts. The

language of both VAR Agreement Amendment and the First Amendment To the SPA is clear and unambiguous and there is no evidence that Hippenmeyer is not a person of "ordinary mind." Therefore, Hippenmeyer knew or could have known the contents of the VAR Agreement Amendment and the First Amendment To the SPA by merely reading what he signed before he did so.

Hippenmeyer can hardly be heard to say that he was negligently misled into signing the VAR Agreement Amendment and the First Amendment To the SPA. Therefore, there are no genuine issues of material fact and MCI is entitled to judgment as a matter of law on CCS's Third Claim for Relief for negligent misrepresentation.

**Mistake**

A mutual mistake as to a material part of a contract is grounds to rescind the contract absent failure to exercise ordinary care to discover the mistake by the party seeking to rescind the contract. *Patel v. Larkin*, No. 1999 AP 01 0005, 2000 WL 94498 at *5 (Ohio Ct. App. Dec. 28, 1999). A mistake is material to a contract when the mistake regards a basic assumption upon which the contract was made. *Id.* To be actionable, the intention of the parties must have been frustrated by the mutual mistake. *Id.* at *4.

In this case, MCI argues that there was no mistake. Contracting parties have a right to make their agreements, or any amendments to them, retroactive.

CCS responds that both Parties were mistaken as to the effect of the VAR Agreement Amendment because, at the time in March of 2005, when the VAR Agreement Amendment was executed, there was no VAR Agreement to amend making the amended VAR Agreement a nullity. Because the VAR Agreement Amendment was a nullity, according to CCS, the Parties

were mistaken as to the effect of the VAR Agreement Amendment.

However, there is no reliable evidence that MCI was mistaken regarding amending the VAR Agreement. The Parties expressly made the VAR Agreement Amendment effective January 1, 2005, and the SPA, which did away with the VAR Agreement, was effective February 1, 2005. Thus, the VAR Agreement Amendment went into effect before and not after the VAR Agreement was terminated.

CCS has not shown that MCI was mistaken. Therefore, there was no mutual mistake. Thus, there are no genuine issues of material fact and MCI is entitled to judgment as a matter of law on CCS's Fourth Claim for Relief for mistake.

## Violation of R.C. § 1335.11

Chapter 1335 of the Ohio Revised Code requires a principal to pay the sales representative all commissions due upon termination of a contract at the time of termination of the contract. R.C. § 1335.11(C). If the sales representative proves that the failure to pay the commissions was willful, wanton or reckless misconduct or bad faith, damages may be up to three times the amount of the commissions owed. *Id.*

As set forth above under the analysis of CCS's breach-of-contract claim, there are genuine issues of material fact as to whether CCS has been paid all of the residual commissions which were due under the "evergreen" provision of the SPA. Therefore, neither party is entitled to judgment as a matter of law on CCS's claim that MCI has violated R.C. § 1335.11.

## Unjust Enrichment

In Ohio, absent fraud, illegality or bad faith, a party to an express contract may not bring a claim for equitable relief, including unjust enrichment and promissory estoppel, particularly

when the contract contains a provision governing the allegedly inequitable conduct at issue. *Comtide Holdings, LLC v. Booth Creek Management Corp.*, 554 F. Supp.2d 821, 827 (S.D. Ohio 2008)(citing *Hughes v. Oberholtzer*, 123 N.E.2d 393, 396 (Ohio 1954)), *rev'd on other grounds by* 2009 WL 1884445 (6th Cir. July 2, 2009). This is because equitable remedies permit the court to give legal force to the reasonable expectations of the parties when the parties did not form an agreement manifesting their specific intent on the issue being addressed. *Id.*

Unjust enrichment generally arises outside the parameters of an express contract. *Palm Beach Co. v. Dun & Bradstreet, Inc.*, 665 N.E.2d 718, 722 (Ohio Ct. App. 1995)(citing *Hughes*, 123 N.E.2d 393). It is generally based upon fraud and bad faith arising from a pattern of activity which has little to do with the contract terms. *Id.*

A claim for unjust enrichment requires the claimant to show that a benefit was conferred upon another party, that the other party knew of the benefit, and that it would be unjust to allow the other party to retain the benefit without paying for it. *Maverick Oil*, 872 N.E.2d at 330(citing *Johnson v. Microsoft Corp.*, 834 N.E.2d 791 (Ohio 2005)). Further, the plaintiff must show that the substantial benefit to the defendant is "causally related" to the substantial detriment to the plaintiff. *The Andersons*, 348 F.3d at 501. Finally, the Sixth Circuit has repeatedly held that a plaintiff cannot sue for the recovery of sales commissions under the theory of unjust enrichment when it has an express contract with the defendant covering the payment of such commissions. *Urban Associates, Inc. v. Standex Electronics, Inc.*, 216 Fed. Appx. 495, 512 (6th Cir. 2007).

In this case, MCI argues that the fully integrated written contracts between the Parties address all of the terms, conditions and circumstances upon which CCS was entitled to receive commissions. As with its fraudulent inducement and negligent misrepresentation claims, CCS

responds that MCI fraudulently induced CCS to sign the VAR Agreement Amendment and the First Amendment To the SPA by concealing and misrepresenting their purpose. When CCS signed the VAR Agreement Amendment, it was, according to CCS, with the assurance that the purpose of the amendment was for CCS to receive commissions on the CNG account. Also, according to CCS, when it signed the First Amendment To the SPA, it was assured that the purpose of this amendment was to change the bonus month. As a result, according to CCS, MCI has been unjustly enriched.

The VAR Agreement, the VAR Agreement Amendment and the SPA are fully integrated. Fraud, illegality or bad faith on the part of MCI has not been shown. Further, CCS's unjust enrichment claim is for commissions which are addressed in detail in the written agreements. Therefore, CCS may not bring an unjust enrichment claim. There are no genuine issues of material fact and MCI is entitled to judgment as a matter of law on CCS's Sixth Claim for Relief for unjust enrichment.

## Promissory Estoppel

Ohio recognizes the doctrine of promissory estoppel. *Morgan v. Del Global Technologies Corp.*, No. 3-:05-CV-123, 2007 WL 3227068 at *19 (S.D. Ohio Oct. 29, 2007). The doctrine of promissory estoppel provides that, "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding, if injustice can be avoided only by enforcement of the promise." *Id.*(citing *Talley v. Teamsters, Chauffeurs, Warehousemen, and Helpers, Local No. 377*, 357 N.E.2d 44, 47 (1976)). To prove a promissory estoppel claim, a plaintiff must show: a promise, clear and unambiguous in its terms; reasonable and foreseeable reliance by the party to

whom the promise was made; and injury resulting from the reliance. *Id.*(citing *Rigby v. Fallsway Equipment Co.*, 779 N.E. 2d 1056, 1061 (Ohio Ct. App. 2002)).

In Ohio, where there is an enforceable contract and the parties merely dispute its terms, scope or effect, one party cannot recover for promissory estoppel. *O'Neil*, 497 F.3d at 583. However, a party, by its words or conduct, may waive the terms of a written contract. *Automated Solutions*, 856 N.E.2d at 1016. For example, failing to enforce rights under a contract may amount to an estoppel on the parties so acting. *Id.* Also, any continued, different "course of performance" between parties to a contract manifests a modification of the original agreement. *Id.* This is because the parties are showing that they did not intend for a particular provision in the contract to be strictly observed. *Id.*

MCI argues that CCS is not entitled to judgment on its promissory estoppel claim because the contracts control. CCS responds that MCI promised that, by executing the VAR Agreement Amendment and the SPA, CCS would be paid commissions on the CNG revenues and that its reasonable detrimental reliance on this promise supports a promissory estoppel claim.

The fully integrated VAR Agreement Amendment and SPA address all of the terms, conditions and circumstances under which MCI had an obligation to pay commissions to CCS. Thus, the parties merely dispute the terms, scope or effect of these agreements. Since the parties merely dispute the terms, scope or effect of the VAR Agreement Amendment and SPA, CCS cannot recover for promissory estoppel. There are no genuine issues of material fact and MCI is entitled to judgment as a matter of law on CCS's Seventh Claim for Relief for promissory estoppel.

**Unconscionability, Reformation and Rescission**

Unconscionability doctrine has two elements: substantive unconscionability and procedural unconscionability. *Scovill v. WSYX/ABC*, 425 F.3d 1012, 1017 (6th Cir. 2005). Both elements must be shown to prove unconscionability. *Id.*

Substantive unconscionability exists when there are unfair and unreasonable contract terms. *Id.* Procedural unconscionability exists where the circumstances surrounding a party to the contract were such that no voluntary meeting of the minds was possible. *Id.* When considering procedural unconscionability, courts look to the parties age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms of the contract were explained to the weaker party and whether alterations in the printed terms were possible. *Id.*

Regarding reformation and rescission, unless there is fraud or other unlawfulness involved, courts may not modify a voluntary agreement. *Dugan & Meyers Construction Co. v. Ohio Department of Administrative Services*, 864 N.E.2d 68, 73 (Ohio 2007). Thus, if a false representation induces a party to enter into a contract, the contract may be voided. The *Resource Title*, 314 F. Supp.2d at 774. A contract may also be voided if there is a mutual mistake as to a material part of the contract. *Patel*, 2000 WL 94498 at *5.

Reformation is an equitable remedy where the court rewrites a contract because the contract, due to fraud or mistake, does not reflect the intent of the parties. *Comtide*, 554 F. Supp.2d at 829. However, Ohio law does not permit a contract, other than an insurance policy, to be reformed for a unilateral mistake. *Id.* at 830(citing *Bellish v. C.I.T. Corp.*, 50 N.E.2d 147, 151 (Ohio 1943)).

MCI asserts that CCS's unconscionability claim is without merit and there is no basis to

reform or rescind any of the contracts. CCS responds with no facts or argument regarding reformation and rescission. Regarding unconscionability, CCS argues that MCI avoided its commitments to pay CCS commissions through, among other things, superior bargaining power.

Unconscionability

In this case, there is no evidence that there are any unfair or unreasonable contract terms that could result in substantive unconscionability. Hippenmeyer reviewed and agreed to the contracts. Further, Hippenmeyer argues that he is entitled to something that is outside of the contracts and not that the terms of the contracts themselves are unfair or unreasonable.

There is also no evidence of procedural unconscionability. Hippenmeyer is well-educated and well-experienced in his profession, has experience in regularly dealing with commercial contracts, and had read and studied the contracts at issue here before signing them. Finally, he was under no compulsion to sign any of the agreements.

Finally, there is no basis for rescinding or reforming the contracts at issue here. CCS has not shown that MCI committed fraud in the inducement, that MCI negligently misrepresented the terms of the agreement, that MCI was unjustly enriched, or that there was a mutual mistake.

Therefore, there are no genuine issues of material fact and MCI is entitled to judgment as a matter of law. MCI's Motion for Summary Judgment on CCS's Eighth Claim for relief regarding unconscionability, reformation and rescission is granted.

## Counterclaim for Attorney's Fees Under R.C. § 1335.11(D)

The prevailing party in an action brought pursuant to R.C. § 1335.11 is entitled to reasonable attorneys' fees and court costs. R.C. § 1335.11(D). This section, among other things, seeks to deter the assertion of unfounded claims by providing for the recovery of attorneys' fees

and costs by a defendant who successfully defends the claim. *Kosta v. Ohio Outdoor Advertising Corp.*, 659 N.E.2d 810, 811 (Ohio Ct. App. 1995).

As set forth above under the analysis of CCS's breach-of-contract claim, there are genuine issues of material fact as to whether CCS has been paid all of the residual commissions which were due under the "evergreen" provision of the SPA. Therefore, neither party is entitled to judgment as a matter of law on MCI's counterclaim that it is due attorneys' fees and court costs because it is the prevailing party on CCS's claim that MCI has violated R.C. § 1335.11.

## CONCLUSION

CCS's Motion for Summary Judgment on its First Claim for Relief for breach of contract is GRANTED IN PART and OVERRULED IN PART. Likewise, MCI's Motion for Summary Judgment on CCS's First Claim for Relief for breach of contract is GRANTED IN PART and OVERRULED IN PART. There are no genuine issues of material fact and MCI did not breach the VAR Agreement, the SPA and the amendments thereto with regard to payment of commissions to CCS on the CNG account. However, there are genuine issues of material fact as to whether MCI breached the SPA and the amendments thereto regarding commission payments to CCS on the Henny Penny and other accounts.

Because there are genuine issues of material fact as to whether MCI breached the SPA and the amendments thereto regarding the payment of commissions to CCS, there are also genuine issues of material fact as to whether MCI violated Ohio Rev. Code § 1335.11 regarding the payment of commissions. Therefore, CCS is not entitled to summary judgment on its Fifth Claim for Relief for violation of Ohio Rev. Code § 1335.11 and MCI is not entitled to summary judgment on its counterclaim.

There are no genuine issues of material fact and MCI is entitled to judgment as a matter of law on the remainder of CCS's claims including CCS's Second Claim for Relief for fraudulent inducement, Third Claim for Relief for negligent misrepresentation, Fourth Claim for Relief for mistake, Sixth Claim for Relief for unjust enrichment, Seventh Claim for Relief for promissory estoppel and Eighth Claim for Relief for unconscionability, reformation and rescission.

CCS's Partial Motion for Summary Judgment is GRANTED IN PART and OVERRULED IN PART. Likewise, MCI's Motion for Summary Judgment is GRANTED IN PART and OVERRULED IN PART. CCS's claim that MCI breached the various contracts when it failed to pay residual commissions on the Henny Penny and other accounts remains to be adjudicated as does CCS's claim and MCI's counterclaim regarding violation of Ohio Rev. Code § 1335.11.

**DONE** and **ORDERED** in Dayton, Ohio this Ninth day of November, 2009.

**s/Thomas M. Rose**

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record